## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
*2:04 pm, Jan 13, 2022*

|  |  |
|---|---|
| In re: | Chapter 13 |
| BETTY J. HAMILTON, | Number 21-40446-EJC |
| *Debtor.* | |
| TITLEMAX OF GEORGIA, INC., | |
| *Movant,* | |
| v. | Contested Matter |
| BETTY J. HAMILTON, | |
| *Respondent.* | |

## OPINION ON MOTION FOR STAY RELIEF

Before the Court is the Motion for Relief from Automatic Stay (the "Motion for Stay Relief") filed by TitleMax of Georgia, Inc. ("TitleMax"). (Dckt. 17). Betty J. Hamilton, the Debtor in this case, entered into a 30-day title pawn transaction with TitleMax on July 8, 2021, whereby she extended an existing title pawn balance and outstanding charges into a new contract. Four days later, and 26 days before the title pawn transaction "matured," the Debtor filed a Chapter 13 petition on July 12, 2021.

1

She listed the vehicle as an asset of the bankruptcy estate and scheduled TitleMax as a secured creditor. In her plan she proposed to make monthly payments to TitleMax in the amount of $125.00 at 5.25% interest.

On August 25, 2021, one day before the confirmation hearing, TitleMax filed the instant Motion for Stay Relief asserting, pursuant to the Eleventh Circuit case *TitleMax v. Northington (In re Northington)*, 876 F.3d 1302 (11th Cir. 2017), that the vehicle would cease to be property of the bankruptcy estate if the Debtor failed to pay the debt in full by September 10, 2021, the end of the grace period for redeeming the vehicle as extended by 11 U.S.C. § 108(b). At hearings on October 7, 2021, and November 4, 2021, the Debtor argued that the vehicle remained estate property pursuant to a recent decision by a separate panel of the Eleventh Circuit, *Titlemax of Ala., Inc. v. Womack (In re Womack)*, No. 21-11476, 2021 WL 3856036 (11th Cir. Aug. 30, 2021) (per curiam), and that her plan could modify TitleMax's rights pursuant to 11 U.S.C. § 1322(b)(2). This case requires the Court to decide which precedent, *Northington* or *Womack*, to follow.

## I. Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(G). The Court makes the following findings of fact and conclusions of

law pursuant to Rules 9014(c) and 7052 of the Federal Rules of Bankruptcy Procedure.

## II. Findings of Fact

The facts in this case are undisputed. On December 16, 2020, the Debtor entered into a 30-day[1] title pawn transaction whereby she pledged her 2010 Ford Edge to TitleMax in exchange for an initial loan in the amount of $650.00. (Dckt. 32, pp. 9, 12).[2] The Debtor and TitleMax subsequently entered into renewal loans (and the advance of additional funds to the Debtor) and extended the maturity date of the loans several times. (Dckt. 32, pp. 12-14). The final extension took place on July 8, 2021. (Dckt. 17, pp. 6-14; Dckt. 32, p. 14).[3] As reflected by the Pawn Transaction Disclosure Statement and Security Agreement signed by the Debtor on that date, the total amount required to redeem the vehicle was $3,817.19, consisting of $350.00 given directly to the Debtor, the prior account balance of $3,089.22, and a finance charge in the amount of $377.97; the annual percentage rate of interest was 133.71 percent. (Dckt. 17, p. 6). The loan as extended had a new maturity date of August 7, 2021. (Dckt. 17, p. 6).

---

[1] Under Georgia law, "[a]ll pawn transactions shall be for 30 day periods but may be extended or continued for additional 30 day periods." O.C.G.A. § 44-12-131(a)(1).

[2] The parties stipulated to the admissibility of the exhibits attached to TitleMax's Supplement in Support of Motion for Relief from Automatic Stay at Dckt. 32. (11/4/2021 Tr., p. 7).

[3] The parties stipulated to the admissibility of the exhibits attached to TitleMax's Motion for Stay Relief. (10/7/2021 Tr., pp. 13-14).

The Debtor filed a Chapter 13 petition on July 12, 2021. (Dckt. 1). In her schedules, the Debtor indicated that she owned the 2010 Ford Edge, which she valued at $3,700.00, securing the claim of TitleMax pursuant to the title pawn transaction.[4] (Dckt. 1, pp. 10, 17). In her plan, the Debtor classified the claim of TitleMax as fully secured and proposed to make payments in the amount of $125.00 per month at an interest rate of 5.25%. (Dckt. 4, p. 2, ¶ 4(d)). The Debtor proposed to make plan payments for a minimum of 36 months. (Dckt. 4, p. 1, ¶ 2(a)).

The confirmation hearing on the Debtor's Chapter 13 plan was scheduled for August 26, 2021, and objections to confirmation were due no later than 7 days before the confirmation hearing. (Dckt. 10, p. 2-3). TitleMax did not object to confirmation.[5] Instead, on August 25, 2021, the day before the confirmation hearing, TitleMax filed the instant Motion for Stay Relief. (Dckt. 17). According to TitleMax, the Debtor failed to repay the loan by the August 7, 2021 maturity date. (Dckt. 17, p. 1). TitleMax stated that Georgia law gave the Debtor a grace period until September 7, 2021, to redeem the vehicle by paying the balance in full and that § 108(b) of the Bankruptcy Code further extended the redemption period until September 10, 2021. (Dckt. 17, pp. 1-2). Relying on the Eleventh Circuit decision

---

[4] The Debtor identified TitleMax as "TMX Finance LLC Formerly Titlemax." (Dckt. 1, p. 17).

[5] Counsel for TitleMax represented at the November 4, 2021 hearing that his client deliberately chose not to object to confirmation. (11/4/2021 Tr., p. 10-11).

*TitleMax v. Northington (In re Northington)*, 876 F.3d 1302 (11th Cir. 2017), TitleMax asserted that the vehicle would cease to be property of the bankruptcy estate if the Debtor failed to pay the debt in full by September 10, 2021.

TitleMax did not appear at the confirmation hearing on August 26, 2021, at which the Debtor's plan was recommended for confirmation by the Chapter 13 Trustee. (11/4/2021 Tr., pp. 3-4).[6] The order confirming the Debtor's plan was not immediately entered because the Debtor had not yet paid the filing fee in full. (10/7/2021 Tr., p. 22).[7] With TitleMax's Motion for Stay Relief pending, and with no confirmation order having been entered, the September 10, 2021 deadline for the Debtor to redeem the vehicle by repaying TitleMax came and went with no action by the Debtor.

Nongovernmental proofs of claims were required to be filed by September 20, 2021.[8] (Dckt. 10, p. 2, ¶ 8). TitleMax did not file a proof of claim in this case.[9] But on September 23, 2021, the Debtor timely filed a proof of claim on TitleMax's behalf.[10] (Claim No. 4-1). The proof of claim indicated that the $3,700.00 claim was

---

[6] This designation shall refer to the transcript of the November 4, 2021 hearing. (Dckt. 37).

[7] This designation shall refer to the transcript of the October 7, 2021 hearing. (Dckt. 35).

[8] *See* Fed. R. Bankr. P. 3002(c).

[9] Counsel for TitleMax represented at the November 4, 2021 hearing that his client deliberately chose not to file a claim in the case. (11/4/2021 Tr., p. 12).

[10] *See* Fed. R. Bankr. P. 3004.

5

secured by the 2010 Ford Edge. (Claim No. 4-1, p. 2). The Debtor did not attach any supporting documentation to the proof of claim.

The Motion for Stay Relief came on for hearing on October 7, 2021. (Dckt. 19). At that hearing, the Court heard argument from Debtor's counsel and from counsel for TitleMax; the Court also heard from counsel for the Chapter 13 Trustee. Citing the recent decision *Titlemax of Ala., Inc. v. Womack (In re Womack)*, No. 21-11476, 2021 WL 3856036 (11th Cir. Aug. 30, 2021) (per curiam), Debtor's counsel asserted that the vehicle remained property of the bankruptcy estate because the Debtor filed bankruptcy before the maturity date of the title pawn contract and that she could modify the rights of TitleMax as a holder of a secured claim under § 1322(b)(2).[11] (10/7/2021 Tr., pp. 7-10, 16-17). For his part, counsel for TitleMax argued that *Womack*, an unpublished and hence nonbinding decision, is not persuasive authority in this case. In particular, counsel observed that *Womack* involved Alabama's pawn statute, whereas the instant case involves Georgia's statute. Counsel argued that material differences between Georgia and Alabama pawn law render *Womack* inapplicable. (10/7/2021 Tr. pp. 3-6). At the conclusion of the hearing, the Court continued the matter to allow the parties to supplement the

---

[11] Section 1322(b)(2) provides that a Chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence[.]" 11 U.S.C. § 1322(b)(2).

record with the full history of the Debtor's title pawn transaction, but neither party initially did so. (10/7/2021 Tr., pp. 15-16, 22).

A continued hearing was scheduled for November 4, 2021. (Dckt. 27). On November 1, 2021, the Debtor filed a brief in response to the Motion for Stay Relief. (Dckt. 29). TitleMax filed a reply brief on November 3, 2021. (Dckt. 30). At the November 4, 2021 hearing, neither party presented evidence, but based on the Debtor's consent, the Court stated that TitleMax would be permitted to supplement the record by way of affidavit. (11/4/2021 Tr., pp. 6-10). The parties agreed that beginning upon confirmation of the Debtor's plan and pending resolution of the Motion for Stay Relief, the Chapter 13 Trustee would hold in reserve the funds paid into the plan pursuant to the plan treatment of TitleMax. (11/4/2021 Tr., p. 15). The Court took under advisement TitleMax's Motion for Stay Relief. (11/4/2021 Tr., pp. 10-16).

Following that hearing, TitleMax filed its Supplement in Support of Motion for Relief from Automatic Stay on November 10, 2021. (Dckt. 32). That supplement included an affidavit of TitleMax's Senior Director of Bankruptcy Operations, copies of the certificate of title to the vehicle; the initial $650.00 check made out to the Debtor by TitleMax; a Form MV-1 Motor Vehicle Title Application signed by the Debtor on December 16, 2020; a Limited Power of Attorney signed by the Debtor, and the loan history reflecting the various loan extensions and renewals.

7

(Dckt. 32, pp. 4-14). Following the Debtor's payment of the final installment of the filing fee, the Court entered an order confirming her Chapter 13 plan on November 17, 2021. (Dckt. 33). Transcripts of the October 7, 2021 hearing and the November 4, 2021 hearing were filed on December 27, 2021. (Dckt. 35, 37). This matter is now ripe for ruling.

## III. <u>Conclusions of Law</u>

This case presents the latest iteration of a recurring question: how do title pawn transactions under Georgia's pawn statute fit into the federal Bankruptcy Code? "Georgia's 'pawn' law states that any 'pledged'—*i.e.* pawned—item that is not 'redeemed' within a statutory prescribed grace period 'shall be automatically forfeited to the pawnbroker by operation of [law], and any ownership interest of the pledgor . . . shall be automatically extinguished in the pledged item." *TitleMax v. Northington (In re Northington)*, 876 F.3d 1302, 1305 (11th Cir. 2017) (quoting O.C.G.A. § 44-14-403(b)(3)).

In the case of *TitleMax v. Northington (In re Northington)*, 876 F.3d 1302 (11th Cir. 2017), which is binding precedent, the Eleventh Circuit held that Georgia law continues to operate even when the borrower files for Chapter 13 bankruptcy before the expiration of the grace period, with the result that the vehicle ceases to be property of the bankruptcy estate. In the subsequent unpublished decision of *Titlemax of Ala., Inc. v. Womack (In re Womack)*, No. 21-11476, 2021 WL 3856036

8

(11th Cir. Aug. 30, 2021) (per curiam), however, the Eleventh Circuit reached a different conclusion under Alabama law where the borrower filed for Chapter 13 before the loan's maturity date. There, the debtor was permitted to treat the pawnbroker as a secured creditor whose rights could be modified under § 1322(b)(2) of the Bankruptcy Code. For the reasons set forth below, the Court finds that *Womack* is unpersuasive. Therefore, the Court will follow the binding precedent of *Northington*.

A. Georgia's Title Pawn Statute

Pawn transactions have existed since antiquity.[12] Title pawn transactions, however, are of a more recent vintage. Georgia's current pawnbroker statute went into effect in 1992.[13] Under the statute, a pawn transaction is "any loan on the security of pledged goods or any purchase of pledged goods on the condition that the pledged goods may be redeemed or repurchased by the pledgor or seller for a fixed price within a fixed period of time." O.C.G.A. § 44-12-130(3). Pledged goods,

---

[12] *See, e.g.,* Wendy A. Woloson, *In Hock: Pawning in Early America*, Journal of the Early Republic, Vol. 27, No. 1, pp. 35-81 (Spring 2007); Raymond de Roover, *The Three Golden Balls of the Pawnbrokers*, Bulletin of the Business Historical Society, Vol. 20, No. 4, pp. 117-124 (Oct. 1946) ("This type of loan . . . existed in ancient Greece at the time of Pericles and in ancient Rome at the time of Augustus.")

[13] Of course, this statute represented an effort by the Georgia legislature to regulate an extant industry. *See* J. Anthony Love, *Pawnbrokers: Provide Comprehensive Legislation Regulating Loans on Motor Vehicle Titles*, 9 Ga. St. U. L. Rev. 323 (Oct. 1992). For prior versions of Georgia's pawn law, *see* 1989 Ga. Laws 819; 1945 Ga. Laws 189; Ga. Code 1933 § 12-601 *et seq.*; 1887 Ga. Laws 36; 1868 Ga. Laws 136.

in turn, are "tangible personal property, including, without limitation, all types of motor vehicles, which property is purchased by, deposited with, or otherwise actually delivered into the possession of a pawnbroker in connection with a pawn transaction." O.C.G.A. § 44-12-130(5). However, with regard to motor vehicles, the statute goes on to provide the following:

> [P]ossession of any motor vehicle certificate of title which has come into the possession of a pawnbroker through a pawn transaction made in accordance with law shall be conclusively deemed to be possession of the motor vehicle, and the pawnbroker shall retain physical possession of the motor vehicle certificate of title for the entire length of the pawn transaction but shall not be required in any way to retain physical possession of the motor vehicle at any time.

O.C.G.A. § 44-12-130(5). Thus, in Georgia at least, title pawn transactions differ from other pawn transactions insofar as the borrower continues to possess and operate the vehicle; the pawnbroker merely holds the certificate of title for the duration of the transaction. During this time, the pawnbroker has a lien on the vehicle "for the money advanced, interest, and pawnshop charge owed[.]" O.C.G.A. § 44-14-403(a). But, as with all pawn contracts under the Georgia statute, a title pawn transaction is non-recourse, meaning that the borrower has no personal obligation to repay the pawnbroker. *See* O.C.G.A. § 44-12-137(a)(7) (prohibiting pawnbroker from "mak[ing] any agreement requiring the personal liability of a pledgor or seller").

10

All pawn transactions, including those involving motor vehicles, "shall be for 30 day periods[.]"[14] O.C.G.A. § 44-12-131(a)(1). The end of this 30-day period is referred to as the "maturity date." O.C.G.A. § 44-14-403(b)(2). Failure to repay the loan by the maturity date constitutes default, upon which the pawnbroker has "the right to take possession of the motor vehicle[.]" O.C.G.A. § 44-12-131(a)(3). However, the statute provides for "a grace period on all pawn transactions." O.C.G.A. § 44-14-403(b)(1). The grace period begins running "on the first day following the maturity date of the pawn transaction[.]"[15] O.C.G.A. § 44-14-403(b)(2). "On pawn transactions involving motor vehicles or motor vehicle certificates of title, the grace period shall be 30 calendar days[.]" O.C.G.A. § 44-14-403(b)(1). The borrower may "redeem" the pledged goods within the grace period "by the payment of any unpaid accrued fees and charges, the repayment of the principal, and the payment of an additional interest charge not to exceed 12.5 percent of the principal." O.C.G.A. § 44-14-403(b)(3). If the borrower fails to redeem the pledged goods within the grace period, those goods "shall be automatically forfeited to the pawnbroker by operation of this Code section, and any ownership interest of

---

[14] The initial 30-day period "may be extended or continued for additional 30-day periods." O.C.G.A. § 44-12-131(a)(1).

[15] Upon any extension, "[t]he grace period shall begin running . . . on the first day following the expiration of any extension or continuation of the pawn transaction[.]" O.C.G.A. § 44-14-403(b)(2).

the pledgor or seller shall automatically be extinguished as regards the pledged item." *Id.*

B. *Northington*

In 2017, the Eleventh Circuit was called upon to address the interplay between Georgia's title pawn statute and the Bankruptcy Code in *Northington*. There, the debtor entered into a pawn transaction with TitleMax on September 2, 2015, and the loan's maturity date was October 2, 2015. *Northington*, 876 F.3d at 1306. The debtor failed to repay the loan by the maturity date. With the 30-day grace period set to expire on November 2, 2015, the debtor filed a Chapter 13 petition on October 30, 2015. *Id.* Thus, the debtor filed the petition after the maturity date but before the expiration of the grace period.

As the Eleventh Circuit noted, § 108(b) of the Bankruptcy Code extended the state-law grace period an additional 60 days from the petition date, giving him until December 29, 2015, to redeem the vehicle.[16] *Id.* But the debtor took no action to redeem before this 60-day period expired. Instead, with the vehicle still in his possession, he filed a Chapter 13 plan treating TitleMax as a creditor holding a claim

---

[16] Section 108(b) provides that "if applicable nonbankruptcy law . . . fixes a period within which the debtor . . . may . . . cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) 60 days after the order for relief." 11 U.S.C. § 108(b).

12

secured by the vehicle. Before the January 21, 2016 confirmation hearing, TitleMax moved for stay relief on January 8, 2016, arguing that the vehicle was no longer part of the bankruptcy estate because the debtor failed to redeem it within the grace period as extended by § 108(b). *Id.* After the confirmation hearing, the bankruptcy court confirmed the debtor's plan on February 9, 2016. *Id.*

On April 29, 2016, the bankruptcy court denied TitleMax's motion for stay relief, holding that the vehicle and its associated right of redemption remained property of the bankruptcy estate after the extended grace period expired.[17] *Id.* at 1307. Accordingly, the court held, TitleMax was the holder of a secured claim that could be modified under § 1322(b)(2). *Id.* The court alternatively concluded that the order confirming the debtor's plan barred stay relief for TitleMax, which failed to object to confirmation, pursuant to the doctrine of res judicata as codified in § 1327(a). *Id.* The district court affirmed the bankruptcy court's decision on the merits but did not address the res judicata issue.[18] *Id.*

On appeal, a panel of the Eleventh Circuit first addressed the bankruptcy court's holding that stay relief was barred on res judicata grounds. As the Eleventh Circuit observed, § 1327(a) provides that "[t]he provisions of a confirmed plan bind

---

[17] *See Title Max v. Hurst (In re Northington)*, 550 B.R. 644 (Bankr. M.D. Ga. 2016); *Title Max v. Hurst (In re Wilber)*, 551 B.R. 542 (Bankr. M.D. Ga. 2016).

[18] *See TitleMax v. Northington*, 559 B.R. 542 (M.D. Ga. 2016).

the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." 11 U.S.C. § 1327(a). Notwithstanding this language, however, the panel disagreed with the bankruptcy court that TitleMax impermissibly slept on its rights by failing to object to confirmation. Rather, "even before the bankruptcy court held a confirmation hearing, and thus by definition before it entered any confirmation order, TitleMax filed a written motion" contending that the vehicle ceased to be property of the estate upon the expiration of the extended grace period. *Id.* at 1307-08. According to the Eleventh Circuit, TitleMax was not required to file an objection to confirmation because it "adequately preserved its position through its pre-confirmation motion for relief from the automatic stay[.]" *Id.* at 1308. In so doing, TitleMax "put the *substance* of its position . . . squarely before the bankruptcy court." *Id.* (emphasis in original). Under this "particular (and peculiar) factual and procedural posture," the panel held that the res judicata provision of § 1327(a) did not bar the motion for stay relief.[19]

Turning to the merits, the Eleventh Circuit held that on the petition date, the motor vehicle became property of the bankruptcy estate. That is because § 541(a) of the Bankruptcy Code provides that "[t]he commencement of a case . . . creates an

---

[19] Relying on *Northington*, TitleMax likewise filed a pre-confirmation motion for stay relief, rather than an objection to confirmation, in this case. The Debtor in this case has not asserted that TitleMax's motion is barred by res judicata.

estate . . . comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Eleventh Circuit found that "existing precedent support[ed] the parties' shared view that both the [vehicle] and the right of redemption became estate assets upon the filing of [the debtor's] bankruptcy petition." *Id.* at 1310. However, that determination was not the end of the inquiry; the "controlling question" was "whether, despite the expiration of the prescribed grace period, those assets *remained* in the estate at the time of confirmation, such that TitleMax's rights in them could be 'modif[ied]' under Section 1322(b)(2)." *Id.* (emphasis in original).

Citing Supreme Court precedent for the proposition that "the nature of a debtor's property interest in a particular asset . . . turns on state law," the Eleventh Circuit panel found that Georgia's pawn statute was "crystal clear[.]" *Id.* at 1311 (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)). Under the Georgia statute, specifically O.C.G.A. § 44-14-403(b), "the expiration of the redemption period is conclusive—the debtor loses title to his pawned property, which vests immediately and by operation of law in the pawnbroker." *Id.* And nowhere did the Bankruptcy Code clearly indicate any congressional intent to supersede Georgia law on this issue. The panel further noted that while § 362 of the Code "prevents creditors from taking steps to actively pry assets out of a debtor's estate" upon the petition date, it

15

"does not separately prevent those assets from evaporating on their own . . . pursuant to the ordinary operation of state law." *Id.* at 1313.

The Eleventh Circuit rejected the debtor's argument that § 541 "froze" the vehicle in the bankruptcy estate upon the commencement of the case. According to the panel, the bankruptcy estate does not remain static "but rather can, in certain circumstances, expand or contract in accordance with the operation of underlying state-law property rules." *Id.* at 1314. As the panel elaborated:

> Properly understood, the Bankruptcy Code takes an estate's constituent property interests as it finds them. If an asset is by its state-law nature static, then it remains so in the bankruptcy estate. If, by contrast—as is often the case—state law imbues an estate asset with a sort of internal dynamism, then that characteristic will follow the asset into the estate.

*Id.* Applying this reasoning to the facts of *Northington*, the Eleventh Circuit found that upon the maturity date of the title pawn transaction, the debtor "had a conditional right to possess the [vehicle] as well as a right to redeem it during the statutory period." *Id.* at 1315. When the debtor failed to do so, his rights in the vehicle were automatically forfeited to TitleMax, and the vehicle ceased to be property of the bankruptcy estate. *Id.* It was improper, therefore, for the debtor's plan to treat TitleMax as a secured creditor subject to modification under § 1322(b)(2). The rule adopted in *Northington*, the panel observed, "ha[d] been embraced by a number— and seemingly a clear majority—of bankruptcy courts deciding materially identical

16

cases."[20] The Eleventh Circuit reversed the district court's affirmance of the bankruptcy court and remanded the case.

If *Northington* had been the Eleventh Circuit's final word on the matter of title pawn transactions, the outcome of this case would be straightforward. As in *Northington*, TitleMax staked out its position in the form of a pre-confirmation motion for stay relief rather than an objection to confirmation. Here, objections to confirmation were due no later than August 19, 2021, which was seven days prior to the confirmation hearing, and TitleMax filed its Motion for Stay Relief on August 25, 2021, one day prior to that hearing. While objecting to confirmation would be the better practice,[21] the Debtor in this case has not argued that TitleMax is barred by res judicata, and the Court finds, consistent with *Northington*, that TitleMax adequately preserved its argument that the vehicle fell out of the bankruptcy estate

---

[20] *See, e.g., First Am. Title Lending of Ga., LLC v. Holt (Matter of Holt)*, No. 16-12150-WHD, 2017 WL 892333 (Bankr. N.D. Ga. March 6, 2017); *TitleMax of Ga. Inc. v. Stanfield (In re Stanfield)*, No. 15-50612, 2016 WL 669472 (Bankr. S.D. Ga. Feb. 18, 2016); *Paul v. South Ga. Title Pawn (In re Paul)*, 534 B.R. 430 (Bankr. M.D. Ga. 2015); *In re Jones*, 544 B.R. 692 (Bankr. M.D. Ala. 2016); *In re Chastagner*, 498 B.R. 376 (Bankr. S.D. Ga. 2013) (Chapter 7 case); *In re Bramlett*, 483 B.R. 244 (Bankr. N.D. Ala. 2012); *Moore v. Complete Cash Holdings, LLC (In re Moore)*, 448 B.R. 93 (Bankr. N.D. Ga. 2011); *Oglesby v. Title MAX (In re Oglesby)*, No. 01-4072, 2001 WL 34047880 (Bankr. S.D. Ga. Oct. 23, 2001). *But see In re Burnsed*, 224 B.R. 496 (Bankr. M.D. Fla. 1998). Several other pre-*Northington* cases involved vehicles that never became estate property because the grace period expired prepetition. *See, e.g., USA Title Pawn v. Askew (In re Howard)*, 507 B.R. 394 (Bankr. N.D. Ga. 2014); *Geddes v. Mayhall Enter., LLC (In re Jones)*, 304 B.R. 462 (Bankr. N.D. Ga. 2003).

[21] Three times the *Northington* panel emphasized that its decision on the res judicata issue was based on that case's "particular circumstances," "unique facts," and "particular (and peculiar) factual and procedural posture." *Northington*, 876 F.3d at 1307-09.

after the extended grace period. And as to the merits, *Northington* would, on its face, seem to require the Court to grant the Motion for Stay Relief on grounds that the vehicle is no longer property of the bankruptcy estate. After all, the Debtor failed to redeem the vehicle within the statutory period.[22] But *Northington* was not the final word on the matter.

## C. *Womack*

Four years after *Northington*, the relationship between the Bankruptcy Code and state title pawn law again came before the Eleventh Circuit in *Womack*. There, the statute at issue was Alabama's Pawnshop Act, Ala. Code § 5-19A-1 *et seq*. Under that statute, a pawn transaction is defined as "[a]ny loan on the security of pledged goods or any purchase of pledged goods on condition that the pledged goods are left with the pawnbroker and may be redeemed or repurchased by the seller for a fixed price within a fixed period of time." Ala. Code § 5-19A-2(3). Pledged goods, in turn, are defined as "[t]angible personal property other than choses in action, securities, or printed evidences of indebtedness, which property is purchased by, deposited with, or otherwise actually delivered into the possession of, a pawnbroker in connection with a pawn transaction."[23] Ala. Code § 5-19A-2(6).

---

[22] The maturity date of the pawn transaction was August 7, 2021. The 30-day grace period, therefore, would have ended on September 6, 2021. And the 60-day § 108(b) period would have begun on the petition date and ended on September 10, 2021.

[23] By its terms, the Alabama Pawnshop Act does not explicitly mention title pawn transactions, but the Alabama Supreme Court has held that such transactions are indeed governed by the

The Eleventh Circuit in *Womack* described the Alabama Pawnshop Act as "materially indistinguishable" from the Georgia statute at issue in *Northington*.[24] *Womack*, 2021 WL 3856036, at *3. Like Georgia, Alabama provides for a 30-day grace period following the maturity date of the loan:

> Pledged goods not redeemed on or before the maturity date if fixed and set out in the pawn ticket issued in connection with any transaction shall be held by the pawnbroker for 30 days following that date and may be redeemed or repurchased by the pledgor or seller within the period by the payment of the originally agreed redemption price, and by the payment of an additional pawnshop charge equal to the original pawnshop charge.

Ala. Code § 5-19A-10(b). The Alabama statute further provides that "[p]ledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker." Ala. Code § 5-19A-6. This is similar to the provision of the Georgia statute that failure to redeem within the 30-day grace period results in the automatic forfeiture of the vehicle to the pawnbroker and the extinguishment of the borrower's interest. *See* O.C.G.A. § 44-14-403(b)(3).

---

statute. *See Blackmon v. Downey*, 624 So.2d 1374 (Ala. 1993); *Floyd v. Title Exch. and Pawn of Anniston, Inc.*, 620 So.2d 576 (Ala. 1993).

[24] One apparent difference, however, is that while all Georgia pawn transactions are for 30-day periods, the Alabama statute prohibits a pawnbroker from "providing for a maturity date *less than* 30 days after the date of the pawn transaction." Ala. Code § 5-19A-8(7) (emphasis added).

In *Womack*, the debtor entered into a title pawn transaction on March 1, 2019. *Womack*, 2021 WL 3856036, at *1. The maturity date was March 31, 2019. *Id.* On March 20, 2019, 11 days before the maturity date, the debtor filed a Chapter 13 petition. *Id.* This is the distinction between *Womack* and *Northington*: the debtor in *Womack* filed her bankruptcy petition prior to the maturity date, whereas the debtor in *Northington* filed his petition after the maturity date but before the grace period expired.

The debtor in *Womack*, like the debtor in *Northington*, proposed in her plan to treat TitleMax as a secured creditor whose claim was subject to modification under § 1322(b)(2). TitleMax objected to confirmation, arguing, in reliance on *Northington*, that the vehicle ceased to be property of the bankruptcy estate upon the expiration of the state law grace period, as extended by § 108(b). But the bankruptcy court overruled TitleMax's objection and confirmed the debtor's plan. Because the debtor's title pawn contract had not matured as of the petition date, the court held that the debtor held legal title to the vehicle rather than mere redemption rights and was entitled to treat TitleMax as a secured creditor.[25] *Womack*, 2021 WL 3856036, at *1-2. The district court affirmed.[26]

---

[25] *See In re Womack*, 616 B.R. 420 (Bankr. M.D. Ala. 2020).

[26] *See TitleMax of Alabama, Inc. v. Womack*, No. 2:20-CV-416-WKW, 2021 WL 1343051 (M.D. Ala. Apr. 9, 2021).

The Eleventh Circuit likewise affirmed and, in so doing, distinguished *Womack* from *Northington*. According to the Eleventh Circuit panel in *Womack*, "the property of the debtor's estate" in *Northington* "consisted only of a right to redeem his pawned vehicle." *Id.* at *3. The panel described the debtor's interest as "fixed" in contrast to the "contingent interest that the debtor had in *Northington.*" *Id.* The panel likewise asserted that in *Womack* "the statutory right to redeem in the Alabama Pawnshop Act . . . and the extension of time under the Code . . . never applied to [the debtor] because her vehicle became property of the estate." *Id.* Consequently, the panel stated, the automatic stay of § 362(a) operated to prevent TitleMax from obtaining possession of the vehicle. *Id.* The automatic stay, in other words, "froze the interest of TitleMax as a lienholder with a secured interest in [the debtor's] vehicle[.]" *Id.* As such, the debtor was entitled to modify the rights of TitleMax as the holder of a secured claim.[27] *Id.*

In the instant case, the Debtor contends that *Womack* applies because, as in *Womack*, she filed per bankruptcy petition prior to the loan's maturity date; the petition date was July 12, 2021, and the maturity date was August 7, 2021. Like *Womack*, the principal fact distinguishing this case from *Northington* is that the

---

[27] Other bankruptcy courts have followed *Womack*. *See In re Graham*, No. 21-11104-JCO, 2021 WL 4187953 (Bankr. S.D. Ala. Sept. 14, 2021). That court accepted the reasoning of *Womack* with no additional analysis. *See also In re Arnett*, --- B.R. ---, No. 21-31026-WRS, 2021 WL 5985328, at *6 (Bankr. M.D. Ala. Dec. 16, 2021).

21

petition was filed before, rather than after, the maturity date. Based on this factual distinction, the Debtor seeks to treat TitleMax as a secured creditor whose claim is subject to modification under § 1322(b)(2), contrary to the holding in *Northington*. As will be discussed below, it is difficult to reconcile the holding of *Womack* with the analysis of *Northington*, which it seems to have rejected wholesale.

D. *Womack* is Unpersuasive

While *Womack* is an unpublished *per curiam* decision by a panel of the Eleventh Circuit, *Northington* is a published decision by a different panel. As the Eleventh Circuit Internal Operating Procedures explain, "[u]nder the law of this circuit, published opinions are binding precedent." 11th Cir. R. 36-2, I.O.P. 2 ("Effect of Mandate on Precedential Value of Opinion"). Unpublished opinions, however, are not considered binding precedent. 11th Cir. R. 36-2. *See also U.S. v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013) ("Unpublished opinions are not binding precedent."). Rather, "they may be cited as persuasive authority." 11th Cir. R. 36-2, I.O.P. 6. Such unpublished opinions are "persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n. 7 (11th Cir. 2007). Having carefully considered the legal analysis of *Womack*, the Court finds it unpersuasive, as more fully explained below.

22

i. *Womack* Misinterpreted *Northington*

To begin with, it appears to the Court that the panel in *Womack* misread *Northington* on a critical issue, whether the vehicle ever became part of the bankruptcy estate. According to *Womack*, the debtor in *Northington* had only a "contingent interest" in his vehicle on the petition date. *Womack*, 2021 WL 3856036, at *3. The panel went on to state that the *Northington* debtor filed his petition after the maturity date and before the expiration of the grace period, as extended by § 108(b), and thus "the debtor's estate consisted only of a right to redeem his pawned vehicle." *Id.* In contrast, and in something of a non sequitur, the *Womack* panel stated that "the extension of time under the Code, 11 U.S.C. § 108(b), never applied to [the *Womack* debtor] because her vehicle became property of the estate." *Id.*

But this supposed distinction from *Northington* is no distinction at all. For in *Northington*, too, the property of the estate included more than the mere right to redeem the vehicle; it included the vehicle itself. As the *Northington* panel put it:

> TitleMax concedes, and the parties thus agree, that "on October 30, 2015—the date he filed his bankruptcy petition—[the debtor] retained property interests in the [vehicle] that became 'property of the estate' under 11 U.S.C. § 541." . . . In particular, the parties agree that the car, which remained in [the debtor's] possession, as well as the associated right to redeem it—which at that time had not yet expired—entered the estate with the filing of his petition . . . .

> That all seems right to us. The Supreme Court has observed that "§ 541(a)(1)'s scope is broad," *United States*

23

> *v. Whiting Pools*, 462 U.S. 198, 204, 103 S. Ct. 2309, 76
> L.E.2d 515 (1983), and existing precedent support the
> parties' shared view that both the [vehicle] and the right of
> redemption became estate assets upon the filing of [the
> debtor's] bankruptcy petition.

*Northington*, 876 F.3d at 1309-10. The *Womack* panel incorrectly stated that the

property of the estate in *Northington* consisted only of the right of redemption and

thus started from a false premise.

### ii. *Womack*'s Reliance on the Maturity Date is Misplaced

Likewise, the Court finds that the *Womack* panel drew an artificial distinction

between what are essentially the two redemption periods in a title pawn transaction.

The panel in *Womack* based its decision on the fact that "[w]hen [the debtor] filed

for bankruptcy, 11 days remained for her to repay TitleMax" such that on the petition

date "her pawn contract had not matured and she owned rights to the title and to

possess her vehicle. Short of the date of default, title and right of possession [had yet

to] pass to [TitleMax] to trigger the period to redeem the vehicle." *Womack*, 2021

WL 3856036, at *3.

This is wrong. While it is true that title does not pass until the redemption

period ends, it is not correct to say that default triggers the redemption period. The

contract itself, from its inception, triggered the period to redeem the vehicle. Put

another way, it could be said that there are two "redemption" periods in a Georgia

pawn transaction. During the 30-day period ending on the maturity date, the

24

borrower may redeem the vehicle by repaying the principal plus any statutory permissible fees and charges.[28] And during the 30-day grace period thereafter, the borrower may still redeem the vehicle by repaying the principal along with additional fees and charges not to exceed 12.5 percent.[29] In fact, the required disclosures that the pawnbroker must provide in writing to the borrower include the following:

> (7) A statement in dollar amounts of how much it will cost the seller or pledgor to *redeem* the merchandise in the first 30 day period of the transaction; [and]
>
> (8) A statement in dollar amounts of how much it will cost the seller or pledgor to *redeem* the merchandise in any 30 day period after the first 30 day period of the pawn transaction, provided that all fees and charges have been kept current[.]

O.C.G.A. § 44-12-138(b)(7)-(8) (emphasis added).

These two 30-day periods differ in only two ways. The pawnbroker may repossess the vehicle only upon the maturity date and is not permitted to sell it until the grace period expires. O.C.G.A. § 44-14-403(b)(1). And, in order to redeem the vehicle during the grace period, the borrower must pay an additional interest charge not greater than 12.5 percent. O.C.G.A. § 44-14-403(b)(3). Otherwise, the two

---

[28] In Georgia, the applicable fees and charges are set forth in O.C.G.A. § 44-12-131.

[29] *See* O.C.G.A. § 44-14-403(b)(3).

25

redemption periods are identical in that the borrower may redeem the vehicle by repaying the pawnbroker before the periods expire. Thus, even in an unmatured pawn transaction, all the borrower has is use of the vehicle and the right to redeem. Moreover, *title* to the vehicle remains in the borrower during both the initial 30-day period and in the 30-day grace period. If the borrower redeems the vehicle after maturity, during the grace period, then the borrower simply pays additional interest.[30]

Left unexplained in *Womack* is why different outcomes result when the debtor files a bankruptcy petition during the first redemption period (prior to the maturity date) versus during the second redemption period (the grace period). The *Womack* panel simply declared, with no analysis, its conclusion that the debtor had a fixed interest in her vehicle because "her pawn contract had not matured" on the petition date. *Womack*, 2021 WL 3856036, at *3. But the borrower's interest is not fixed— the clock is still ticking. The Court finds irrelevant to the analysis of *Northington* the distinction between a petition date falling, for example, on day 29 of a 30-day pawn contract versus a petition date falling a few days later, post-maturity.[31]

---

[30] In the event that the pawnbroker takes possession of the vehicle after maturity but before the expiration of the grace period, it may also charge storage fees of no more than $5.00 per day, as well as a repossession fee that varies depending on the distance of the place of repossession from the office where the pawn originated. O.C.G.A. § 44-12-131(a)(4)(C)(ii)-(iii).

[31] At least one bankruptcy court, after *Northington* but before *Womack*, granted TitleMax's motion for stay relief where the petition date was prior to the maturity date. *In re Thompson*, 609 B.R. 443, 453 (Bankr. M.D. Ala. 2019). There, the debtor's "last pawn ticket renewal was dated

### iii. *Womack* Ignores State-Law Defined Property Interests

In holding that the operation of Georgia law caused the vehicle to fall out of the bankruptcy estate, the Eleventh Circuit in *Northington* recognized that "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). Property and interests in property "are creatures of state law." *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992). Although "[w]hether an interest of the debtor[] is property of the estate is a federal question . . . the nature and existence of the debtor['s] right to property is determined by looking [to] state law." *SouthTrust Bank of Ala., N.A. v. Thomas (In re Thomas)*, 883 F.2d 991, 995 (11th Cir. 1989). Pawn transactions are governed by state law. "In this country, the practice of pledging personal property for loans dates back to early colonial times, and pawnshops have been regulated by state laws for more than a century." *Asakura v. City of Seattle*, 265 U.S. 332, 343 (1924).

The Georgia legislature has undertaken to define pawn transactions in terms that clarify the parameters of the transaction and the respective rights of the borrower and the pawnbroker. Part of the legislation is devoted to making clear to borrowers the special nature of pawn transactions. As previously stated, under the Georgia

---

September 1, 2018 with a maturity date of October 1, 2018. She filed her bankruptcy petition on September 14, 2018, which extended her redemption period under the pawn ticket to November 14, 2018 (or 60 days from her petition date)." *Id.* The bankruptcy court held that the vehicle dropped out of the estate when the debtor failed to redeem it, implicitly finding no significance to the petition date falling before the maturity date.

statute, "[a]ll pawn transactions shall be for 30 day periods[.]" O.C.G.A. § 44-12-131(a)(1). "Every pawnbroker in every pawn transaction shall present the pledgor or seller with a written disclosure . . . statement . . . containing the following information:

> . . .
>
> (2) A statement as follows:
>
>> "This is a pawn transaction. Failure to make your payments as described in this document can result in the loss of the pawned item. The pawnbroker can sell or keep the item if you have not made all payments by the specified maturity date.";
>
> (3) If the pawned item is a motor vehicle or motor vehicle certificate of title, a statement as follows:
>
>> "Failure to make your payment as described in this document can result in the loss of your motor vehicle. The pawnbroker can also charge you certain fees if he or she actually repossesses the motor vehicle.";
>
> (4) A statement that the length of the pawn transaction is 30 days and that it can only be renewed with the agreement of both parties and only for 30 day incremental periods[.]
>
> (5) The annual percentage rate, computed in accordance with the federal Truth in Lending Act and regulations under the federal Truth in Lending Act, for the first 30 days of the transaction, computed as if all interest and pawnshop charges were considered to be interest;
>
> . . .

28

> (11) A statement that after the grace period the pledged goods become the property of the pawnbroker[.]

O.C.G.A. § 44-12-138(b). In order to emphasize the transaction's special nature, the pawnbroker also must "include most prominently in any and all types of advertisements the word 'pawn' or the words 'pawn transaction.'" O.C.G.A. § 44-12-138(a)(1). "On any sign advertising a pawnbroker's business, the words on such sign shall be in at least 24 inch high letters." O.C.G.A. § 44-12-138(a)(2). The pawnbroker cannot "use the term 'loan' in any advertisements or in connection with any advertising of the business of the pawnbroker[.]" O.C.G.A. § 44-12-138(a)(1).

Further, the pawnbroker is not required to renew the contract. *See* O.C.G.A. § 44-14-403(b)(2).[32] Perhaps most important of all is that the borrower has no obligation to repay the loan. O.C.G.A. § 44-12-137(a)(7). Consistent with the Georgia statute, the contract in this case states as follows:

> Non-Recourse: This Pawn is non-recourse to you. You shall have no obligation to redeem the Vehicle or make any payment on this Pawn. Nothing in this Agreement gives us any recourse against you personally other than our right to take possession of the Vehicle upon your default, and to sell or otherwise dispose of the Vehicle in accordance with Georgia law.

---

[32] The contract in this case is consistent with this statutory provision. *See* (Dckt. 17, pp. 7-8, ¶ 5) ("We may agree to extend the Maturity Date in our discretion.").

(Dckt. 17, p. 8, ¶ 6). This is how the Georgia General Assembly chose to define

property interests in a pawn transaction. The Supreme Court explained in *Butner* that

courts must respect these state-law property interests absent any clear indication to

the contrary in the Bankruptcy Code:

> Congress has generally left the determination of property
> rights in the assets of a bankrupt's estate to state law.
> Property interests are created and defined by state law.
> Unless some federal interest requires a different result,
> there is no reason why such interests should be analyzed
> differently simply because an interested party is involved
> in a bankruptcy proceeding. Uniform treatment of
> property interests by both state and federal courts within a
> State serves to reduce uncertainty, to discourage forum
> shopping, and to prevent a party from receiving a windfall
> merely by reason of the happenstance of bankruptcy. The
> justifications for application of state law are not limited to
> ownership interests; they apply with equal force to
> security interests . . . .

*Butner*, 440 U.S. at 54-55 (internal quotations and citations omitted).

Following this guidance, the Eleventh Circuit panel in *Northington* held that

the vehicle ceased to be part of the bankruptcy estate once the redemption periods

expired. Citing O.C.G.A. § 44-14-403(b), which provides that unredeemed pledged

goods are "automatically" forfeited to the pawnbroker and the borrower's interest

"automatically" extinguished, the panel found nothing in the Bankruptcy Code that

"thwarted the normal operation of the Georgia pawn statute's automatic

extinguishment provision." *Northington*, 876 F.3d at 1315. If the Court were to hold,

consistent with *Womack*, that the vehicle remained in the bankruptcy estate

notwithstanding the post-petition expiration of the redemption period, it would have to ignore the defined property interests under state law. Instead, the Court, guided by the binding precedent of *Northington*, will follow *Butner*'s directive to respect state law.

iv. *Womack* Improperly Relied on the Automatic Stay

In contrast to *Northington*, the *Womack* panel held that the automatic stay provisions of § 362(a) "froze the interest of TitleMax as a lienholder with a secured interest in [the debtor's] vehicle . . . for the amount of its interest in the automobile." *Womack*, 2021 WL 3856036, at *3 (internal quotations omitted). The panel similarly described the debtor as having a "fixed interest in her vehicle[.]" *Womack*, 2021 WL 3856036, at *3. But this "freezing" argument was addressed in some detail in *Northington*. There, the Eleventh Circuit observed that under § 362(a), a bankruptcy petition "operates as a stay" of various actions, including the "commencement or continuation" of certain "judicial, administrative, or other action[s]," any "act to obtain possession of property of the estate," any "act to create, perfect, or enforce" pre-petition liens, and any "act to collect, assess, or recover" a pre-petition claim against the debtor. *Northington*, 876 F.3d at 1312-13.

The *Northington* panel, however, rejected the argument that § 362(a) freezes an unexpired state-law redemption period. In that panel's view "[r]eading the automatic-stay provision to effect an open-ended extension of a state-law

31

redemption period" would allow the general statutory language of § 362(a) to supersede the more specific language of § 108(b). *Id.* at 1313. *See Bloate v. U.S.*, 559 U.S. 196, 207-08 (2010) (noting that the "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment"). Moreover, reading § 362(a) to freeze the redemption period "would render Section 108(b) entirely superfluous." *Id.* at 1313. In the view of the *Northington* panel, § 362(a) "specifically targets the affirmative conduct of creditors" but "does not separately prevent those assets from evaporating on their own . . . pursuant to the ordinary operation of state law." *Id.* at 1313-14. Nothing in *Northington* so much as hinted that filing a bankruptcy petition before the title pawn maturity date would change this analysis and freeze the parties' interests in the vehicle. Rather, the *Northington* panel stated that "[i]f . . . state law imbues an estate asset with a sort of internal dynamism, then that characteristic will follow the asset into the estate." [33] *Northington*, 876 F.3d at 1314. The *Womack* panel ignored this notion of internal dynamism when it held that the automatic stay froze the vehicle in the bankruptcy estate.

---

[33] By way of example, the *Northington* panel cited option contracts, stating that "[i]f the debtor fails to exercise the option in accordance with state law, then the right to buy disappears." *Northington*, 876 F.3d at 1315. This dynamism can also be seen in § 541(b)(2), where property of the estate "ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case[.]" 11 U.S.C. § 541(b)(2).

E. Did the Vehicle Drop Out of the Estate pursuant to § 541(b)(8)?

Curiously, neither *Northington* nor *Womack* discussed in any detail the only Bankruptcy Code provision that actually addresses pawn transactions, namely § 541(b)(8). The *Womack* panel made no reference to it. The *Northington* panel mentioned it only in passing. And few other courts have had much to say about it. But in this case, TitleMax argues that under § 541(b)(8), the vehicle dropped out of the bankruptcy estate upon the Debtor's failure to redeem it.

Prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), the Bankruptcy Code contained no apparent reference to pawn transactions.[34] That changed in 2005, when Congress amended the Code by, among other things, adding § 541(b)(8), which states as follows:

> (b) Property of the estate does not include—
>
> . . .
>
>> (8) subject to subchapter III of chapter 5, any interest of the debtor in property where the debtor pledged or sold tangible personal property (other than securities or written or printed evidences of indebtedness or title) as collateral for a loan or advance of money given by a person licensed under law to make such loans or advances, where—

---

[34] One commentator observed that "Congress spent little ink on the question of pawn transactions" in § 541(b)(8) but that "compared to the absence of statutory treatment which had been the condition for some years, even the small amount of ink has been helpful." Williams, *Bankruptcy Practice Handbook* § 9:8 (2d ed.).

> (A) the tangible personal property is in the possession of the pledgee or transferee;
>
> (B) the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and
>
> (C) neither the debtor nor the trustee have exercised any right to redeem provided under the contract or State law, in a timely manner as provided under State law and section 108(b)[.]

11 U.S.C. § 541(b)(8). The language of this provision is broad; it never explicitly uses the word "pawn." Nevertheless, "its principal, if not exclusive, application is to pawn transactions between a borrower and a pawnbroker licensed under state law."[35] Drake, Bonapfel, Goodman, *Chapter 13 Practice and Procedure* Vol. 2, § 14:16, p. 73 (2021 ed.). The enumerated elements "define the typical pawn transaction," and when those elements are satisfied, "the pledged property in the possession of the pawnbroker is not property of the estate unless the debtor timely redeems it." *Id.* Section 541(b)(8) reflects congressional intent for unredeemed pawned property to

---

[35] One court observed that "the apparent intent of § 541(b)(8)" was "to protect the pawnbroker by allowing the pawnbroker to retain its possessory security interest and, ultimately, the benefit of its bargain—forfeiture of the collateral to it—if the Debtor fails to timely redeem the property under state law, despite the Debtor's filing of a bankruptcy petition." *In re Martin*, 418 B.R. 710, 713 (Bankr. S.D. Ohio 2009). *See also Collier on Bankruptcy* ¶ 541.24 (16th ed.) ("Section 541(b)(8) is broadly drafted and does not use the word 'pawn.' Nonetheless, it may fairly be said that its obvious, fundamental purpose is to declare that certain tangible personal property pledged to pawnbrokers is excluded from property of the estate."); Brown & Ahern, *The Law of Debtors and Creditors: Bankruptcy, Security Interests, Collection* § 1:20 (describing § 541(b)(8) as "a success for lobbying efforts by the pawn industry").

be excluded from the bankruptcy estate. Notably, the section of BAPCPA adding § 541(b)(8) was entitled "Property No Longer Subject to Redemption." Pub. L. 109-8, § 1230. Given the reference to § 108(b) in § 541(b)(8)(C), sometimes this exclusion necessarily occurs post-petition, such that the property will fall out of the bankruptcy estate, just as *Northington* teaches.

Case law on § 541(b)(8) and its application to title pawn transactions is sparse.[36] The first element, § 541(b)(8)(A), requires that the "tangible personal property (other than securities or written or printed evidences of indebtedness or title)" be in the pawnbroker's possession in order for such property to be excluded from the bankruptcy estate. One bankruptcy court has interpreted this language to mean that § 541(b)(8) does not exclude title transactions from the estate. "Plainly," that court stated, "this provision does not apply to vehicle title pawns, because a vehicle certificate of title is evidence of title[.]" *TitleMax of Ga. Inc. v. Stanfield (In re Stanfield)*, No. 15-50612, 2016 WL 669472, at *3 n.3 (Bankr. S.D. Ga. Feb. 18, 2016) (Dalis, J.).[37] But the Court disagrees with this analysis. The tangible personal

---

[36] *See, e.g., Paul*, 534 B.R. at 434 (holding that each element of § 541(b)(8) was satisfied where pawnbroker repossessed vehicle prior to petition date); *Bolton v. Quick Cash Title Loans (In re Bolton)*, 466 B.R. 831, 838-39 (Bankr. S.D. Miss. 2012) (holding that § 541(b)(8) did not exclude vehicle from estate because right to redeem had not expired). In *Bolton*, the court went on to state that if the debtor "wish[ed] to exercise her right of redemption, she must do so by immediate payment of the entire amount due within the statutory redemption period, as extended by § 108(b), not by payment through her Chapter 13 plan." *Bolton*, 466 B.R. at 839.

[37] Notwithstanding its interpretation of § 541(b)(8), the bankruptcy court in *Stanfield* held that when the debtor "failed to redeem the certificate of title by [the expiration of the § 108(b)

property in which TitleMax took a security interest was the vehicle, not the certificate of title. The title is simply the device by which a pawnbroker perfects its lien in the vehicle.

But the possession requirement under § 541(b)(8) is a different question. As TitleMax points out, under Georgia law, possession of a motor vehicle certificate of title is "conclusively deemed" to be possession of the motor vehicle itself. O.C.G.A. § 44-12-130(5). TitleMax avers that this Georgia statutory provision satisfies the § 541(b)(8)(A) requirement that the pawnbroker be in possession of tangible personal property. The Court agrees with TitleMax on this point and finds that this Georgia statute distinguishes the instant case from *Womack*, where the title pawn transaction was governed by Alabama law. Notwithstanding the *Womack* panel's description of Georgia and Alabama title pawn law as "materially indistinguishable," the Court has found no provision in the Alabama Pawnshop Act comparable to O.C.G.A. § 44-12-130(5).[38] As one bankruptcy court explained:

---

period], ownership of the Vehicle transferred by operation of Georgia law to TitleMax. At that point, any legal or equitable interest that [the debtor] possessed was extinguished, the Vehicle was no longer property of the estate, and the automatic stay ceased to apply." *Stanfield*, 2016 WL 669472, at *3.

[38] While the Alabama pawn statute does not have a "deemed possession" provision, Alabama courts have acknowledged the idea that a pawnbroker may have "constructive possession" of a vehicle by virtue of possessing the certificate of title. *See Floyd*, 620 So.2d at 578-79 (noting that the trial court "concluded that the transaction was a 'pawn transaction' within the meaning of the Alabama Pawnshop Act, because [the pawnbroker] had at least 'constructive possession' of the automobile"). *See also TitleMax of Ala., Inc. v. Hambright (In re Hambright)*, --- B.R. ---, No. 20-70608-JHH13, 2021 WL 5441074, at *28; *TitleMax of Ala., Inc. v. Barnett*, No. 5:20-CV-00181-CLM, 2021 WL 426218, at *3 (N.D. Ala. Feb. 8, 2021); *Bramlett*, 483 B.R. at 245-46.

> Notably, unlike Georgia's pawn laws (the subject of
> *Northington*), which (1) *deem* a title lender to have
> possession of a vehicle by virtue of the vehicle's certificate
> of title, (2) give such a title lender a *statutory right* to
> possession of the vehicle *pre-default*, and (3) *categorically
> include* vehicle certificates of title in the state's definition
> of pledged goods—the Alabama Pawnshop Act says
> nothing at all about title loans or certificate of title pledges.

*TitleMax of Ala., Inc. v. Hambright (In re Hambright)*, --- B.R. ---, No. 20-70608-

JHH13, 2021 WL 5441074, at \*23 (Bankr. N.D. Ala. Nov. 19, 2021) (emphasis in

original).[39] That court went on to describe Georgia's title pawn laws as "materially

different" from Alabama's. *Id.* at \*36. Under O.C.G.A. § 44-12-130(5), the Court

finds, a title pawnbroker in possession of the certificate of title has possession of the

vehicle for purposes of § 541(b)(8)(A).

One bankruptcy court has rejected this view, stating that O.C.G.A. § 44-12-

130(5) is "immaterial" to § 541(b)(8) because "bankruptcy law defines what

'property of the estate' includes." *Moore v. Complete Cash Holdings, LLC (In re

Moore)*, 448 B.R. 93, 99 n.8 (Bankr. N.D. Ga. 2011). While this premise is correct,

the conclusion—that the Georgia statute is irrelevant—is not. The Court reads §

541(b)(8) as a general description of pawned property and not an effort to limit the

---

Constructive possession means "[c]ontrol or dominion over a property without actual possession
or custody of it." *Constructive possession*, *Black's Law Dictionary* (10th ed. 2009).

[39] The court in *Hambright* erred when it stated that the pawnbroker has a statutory right to
possession pre-default. In Georgia, the pawnbroker "has upon default the right to take possession
of the motor vehicle." O.C.G.A. § 44-12-131(a)(3).

types of personalty that are excluded after the redemption periods have run. The broad language of § 541(b)(8), which, again, never uses the word "pawn," encompasses the variety of pawn transactions that a state might choose to permit. In three separate places § 541(b)(8) invokes state law: the pawnbroker must be "licensed under law to make such loans or advances," the right to redeem is "provided under the contract or State law," and the timeliness of the redemption is "provided under State law . . . ." 11 U.S.C. § 541(b)(8). Thus, state law, including Georgia's "deemed possession" provision, controls the nature and extent of the debtor's property rights.

If Congress intended to exclude from the exclusion of § 541(b)(8) title pawn transactions, it could have done so clearly. For example, in the "hanging paragraph" of § 1325(a)(9), Congress provided special treatment for certain secured claims, to wit:

> For purposes of paragraph (5) [treatment of secured claims], section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day period preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor . . . .

11 U.S.C. § 1325(a)(9) (hanging paragraph). There is no reason that Congress could not have described title pawn transactions using this degree of specificity. "[I]n any

38

field of statutory interpretation, it is [the court's] duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019). "When 'Congress knows how to say something but chooses not to, its silence is controlling.'" *Whaley v. Guillen (In re Guillen)*, 972 F.3d 1221, 1226 (11th Cir. 2020) (quoting *Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1285 (11th Cir. 2011)).

The Eleventh Circuit in *Northington* cited *BFP v. Resol. Tr. Corp.*, 511 U.S. 531 (1994), for the proposition that "the Bankruptcy Code prevents and counteracts the ordinary operation of" state law only if there is "some clear textual indication that Congress intended that result." *Northington*, 876 F.3d at 1312. "Absent a clear statutory requirement to the contrary, we must assume the validity of [a] state-law regulatory background and take due account of its effect." *BFP*, 511 U.S. at 539. "To displace traditional state regulation . . . the federal statutory purpose must be 'clear and manifest.'" *Id.* at 544 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). The Court finds no clear indication that Congress intended to supersede state law in § 541(b)(8). Thus, by virtue of the Georgia statutory provision for "deemed possession," or constructive possession, title pawn transactions are within the scope of § 541(b)(8).

As mentioned, the *Womack* panel never addressed the scope of § 541(b)(8), nor even mentioned that Code section in its opinion. In fairness, § 541(b)(8) received

only brief mention in *Northington*. There, the dissent argued that "Congress's authoring of this exclusionary provision [§ 541(b)(8)] evinces a congressional intent to permanently include [the debtor's] vehicle in his bankruptcy estate" under the canon of *expressio unius est exclusio alterius*. *Northington*, 876 F.3d at 1324-25. The majority responded to this argument in a footnote. According to the majority, "[t]hat Congress decided *as a matter of federal law* to exclude several specific asset types from a debtor's estate in no way convincingly implies that Congress thereby meant to forestall the ordinary operation of *state-law* rules that define the constituent property rights that comprise the estate." *Id.* at 1314 n.9 (emphasis in original). Thus, the *Northington* panel rejected the notion that § 541(b)(8) operates to include in the bankruptcy estate property not specifically excluded therein. But the panel fell short of explicitly holding that this Code section excluded the vehicle.

In any event, the elements of § 541(b)(8) are all satisfied in this case. The Debtor pledged the vehicle as collateral for a loan. There has been no suggestion that TitleMax is not licensed under Georgia law. The certificate of title is in the possession of TitleMax, and, pursuant to O.C.G.A. § 44-12-130(5), the vehicle itself is deemed to be in the possession of TitleMax. 11 U.S.C. § 541(b)(8)(A). The loan is nonrecourse, and hence the Debtor has no obligation to repay the money or to redeem or buy back the vehicle. 11 U.S.C. § 541(b)(8)(B). And the Debtor has not exercised its right to redeem within the time periods established by Georgia law and

40

§ 108(b). 11 U.S.C. § 541(b)(8)(C). Therefore, the Court finds that the vehicle is no longer property of the bankruptcy estate. But TitleMax's reliance on § 541(b)(8) is not necessary to this Court's decision. As noted, *Northington* did not hold that title pawn transactions are excluded under § 541(b)(8). Even if the pawned vehicle is not excluded under the specific language of § 541(b)(8), it is still subject to falling out of the estate pursuant to *Northington*.

F. An Unredeemed Title Pawn Contract Cannot be Modified under § 1322(b)(2)

The Debtor in this case contends that TitleMax is merely a secured creditor whose claim may be modified under § 1322(b)(2) of the Bankruptcy Code. That provision states that a Chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence[.]" 11 U.S.C. § 1322(b)(2). The Court, however, disagrees with the Debtor and finds that *Northington* does not permit such modification of a title pawn contract.

While the Court is unpersuaded by *Womack*, that is not to say that *Northington* did not raise questions of its own. After all of its discussion of pawn transactions falling out of the estate by operation of Georgia law, *Northington* left open the intriguing possibility, but only in dicta, that § 1322(b)(2) could be used to modify the rights of a title pawnbroker if the plan could be confirmed before the redemption period expired. As the panel put it:

> Because we hold that the car ceased to be property of the bankruptcy estate upon the expiration of the redemption period, it follows that 11 U.S.C. § 1322(b)(2) . . . has no field of application to this case. Under that provision, a Chapter 13 plan can 'modify the rights of holders of secured claims' on property in the estate. 11 U.S.C. § 1322(b)(2). It is axiomatic, though, that a plan can 'modify . . . rights" arising under a 'claim' only if the claim exists at the time the plan would purport to modify the rights associated with it—namely, at confirmation.

*Northington*, 876 F.3d at 1315. The *Northington* panel seems to have made this observation in explanation of its decision not to delve into the scope of § 1322(b)(2).

But the dissent picked up on this opening:

> The majority's holding . . . creates a bizarre incentive for Chapter 13 litigants, and perhaps for bankruptcy courts as well. It appears as though under the majority's rule, if a plan is confirmed before the expiration of a debtor's vehicle redemption period, the plan may modify the rights of secured creditors with respect to that vehicle under § 1322(b)(2). If the plan is confirmed after the redemption period expires, however, the vehicle evaporates from the bankruptcy estate, and the plan cannot apply § 1322(b)(2) to the creditor's secured claim. Therefore, after today's holding, Georgia debtors in a title pawn situation will be in a rush to confirm their Chapter 13 plan, while Georgia title pawn lenders will be incentivized to deliberately delay confirmation until after the redemption period expires.

*Northington*, 876 F.3d at 1325. But *Northington* did not so hold. The panel stated only that TitleMax did not hold a claim at the time of confirmation and, accordingly, that such a nonexistent claim could not be modified by the debtor's plan. Contrary to the dissent's reading, the panel did not create a window of opportunity for a debtor

42

to modify a title pawnbroker's rights by obtaining confirmation prior to the expiration of the redemption period. Such a reading of the above-quoted allusion to the confirmation hearing would make nonsense of everything else *Northington* had to say about the extinguishment of the debtor's interest in the pawned vehicle.

The precedent cited favorably by *Northington* did not allow modification of title pawn contracts under § 1322(b)(2). *Id.* at 1316 n.11. Indeed, two of the cases cited state that § 1322(b)(2) cannot be used to convert a title pawn contract, which is a non-recourse transaction, into a recourse loan. *See Stanfield*, 2016 WL 669472, at *3; *Oglesby v. Title MAX (In re Oglesby)*, No. 01-4072, 2001 WL 34047880, at *3 (Bankr. S.D. Ga. Oct. 23, 2001) (Davis, J.) (finding that "to extend the redemption period by providing for repayment in a Chapter 13 plan would serve to impermissibly re-define state-created property rights by changing a title lender's non-recourse pawn transaction into a recourse loan[.]"). *See also In re Sandrin*, 536 B.R. 309, 323 (Bankr. D. Colo. 2015) ("[N]onrecourse debts in bankruptcy should reflect their status under nonbankruptcy law absent a contrary provision in the Code itself."). In permitting the debtor to modify the pawnbroker's claim under § 1322(b)(2), the *Womack* panel failed to follow not only *Northington* but also the substantial body of precedents cited therein.

43

## IV. <u>Conclusion</u>

Notwithstanding the onerous costs that many desperate consumers incur in pursuing title pawn transactions, they remain lawful in Georgia. Here, the Debtor has not alleged that TitleMax charged fees in excess of those permitted by the statute or that it failed to make all required disclosures. The Court has no power to invalidate the Georgia statute. Of course, the Court is not blind to the nature of title pawn transactions.[40] They have short terms and typically feature triple-digit annual interest rates. And, notwithstanding the "30-day" period of these contracts, many borrowers, like the Debtor in this case, renew their loans and extend the maturity date several times. Pawnbrokers may have strong incentives to agree to these extensions. Nonetheless, the Court finds that nothing in the Bankruptcy Code permits a Chapter 13 debtor to modify a title pawn contract under Georgia law by treating the pawnbroker as a secured creditor where the state-law redemption period, as extended by § 108(b), has expired and the pawnbroker has adequately asserted its rights pre-confirmation. For the reasons set forth above, TitleMax is entitled to the return of its

---

[40] *See* Amanda Quester and Jean Ann Fox, *Car Title Lending: Driving Borrowers to Financial Ruin, The Center for Responsible Learning* (April 14, 2005), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/rr008-Car_Title_Lending-0405.pdf.

collateral under the facts of this case.[41] The Court will grant the Motion for Stay

Relief (dckt. 17) by separate order.

Dated at Savannah, Georgia, this 13th day of January, 2022.

Edward J. Coleman, III, Chief Judge
United States Bankruptcy Court
Southern District of Georgia

---

[41] During the pendency of this contested matter, TitleMax has argued only that stay relief is warranted because the vehicle is no longer part of the bankruptcy estate. Section 362(d), of course, provides that stay relief may be granted "for cause, including the lack of adequate protection." 11 U.S.C. § 362(d)(1). *See, e.g. In re Thompson*, No. 13-11235, 2014 WL 1330110 (Bankr. S.D. Ga. March 31, 2014) (granting stay relief based on lack of adequate protection even where confirmed plan treated TitleMax as secured creditor). TitleMax having asserted no separate grounds for stay relief in this case, the Court is not required to address whether there is adequate protection.